| | |
|---|---|
| **UNITED STATES DISTRICT COURT** | **EASTERN DISTRICT OF TEXAS** |

UNITED STATES OF AMERICA § 
§ 
*versus* § CASE NO. 1:12-CR-119(2)
§ 
TANNER LYNN BOURQUE § 

**MEMORANDUM AND ORDER**

Pending before the court is Defendant Tanner Lynn Bourque's ("Bourque") Motion for Reduction of Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A) (#724). The Government filed a response in opposition (#730). After conducting an investigation, United States Probation and Pretrial Services ("Probation") recommends denying the motion. Having considered the motion, the Government's response, Probation's recommendation, the record, and the applicable law, the court is of the opinion that the motion should be denied.

I.     Background

On March 7, 2013, a federal grand jury in the Eastern District of Texas returned a four-count First Superseding Indictment against Bourque and eleven codefendants, charging Bourque in Count One with Violent Crimes in Aid of Racketeering Activity—Conspiracy to Murder James Lee Sedtal, a/k/a "Lil Bit," in violation of 18 U.S.C. § 1959(a)(5); in Count Two with Violent Crimes in Aid of Racketeering Activity—Murder of James Lee Sedtal, a/k/a "Lil Bit," in violation of 18 U.S.C. § 1959(a)(1); in Count Three with Possession and Discharge of a Firearm in Furtherance of a Crime of Violence Resulting and Drug Trafficking Crime Resulting in Death, in violation of 18 U.S.C. § 924(j); and in Count Four with Conspiracy to Possess with Intent to Distribute a Controlled Substance, in violation of 21 U.S.C. § 846. On July 15, 2013, Bourque pleaded guilty to the offense charged in Count Two of the First Superseding Indictment

pursuant to a binding plea agreement.  Subsequently, on January 6, 2014, the court sentenced

Bourque to life imprisonment, to be followed by five years of supervised release.  Bourque is

currently housed at Federal Correctional Institution Coleman Medium, located in Sumterville,

Florida.

II.    <u>Analysis</u>

A judgment of conviction that imposes a sentence of imprisonment is a "'final judgment'

and may not be modified by a district court except in limited circumstances." *Dillon v. United*

*States*, 560 U.S. 817, 824 (2010) (quoting 18 U.S.C. § 3582(b)); *see* 18 U.S.C. § 3582(c).

Commonly referred to as "compassionate release," § 3582(c)(1)(A) embodies a rare exception to

a conviction's finality.  This statute gives the court discretion, in certain circumstances, to reduce

a defendant's term of imprisonment.  The First Step Act of 2018 ("Act"), Pub. L. No. 115-391,

132 Stat. 5194, in part, amended 18 U.S.C. § 3582(c)(1)(A), which currently provides:

> (A) the court, upon motion of the Director of the Bureau of Prisons [("BOP")], or
> upon motion of the defendant after the defendant has fully exhausted all
> administrative rights to appeal a failure of the [BOP] to bring a motion on the
> defendant's behalf or the lapse of 30 days from the receipt of such a request by the
> warden of the defendant's facility, whichever is earlier, may reduce the term of
> imprisonment (and may impose a term of probation or supervised release with or
> without conditions that does not exceed the unserved portion of the original term
> of imprisonment), after considering the factors set forth in section 3553(a)[1] to the
> extent that they are applicable, if it finds that—

---

[1] Section 3553(a) directs courts to consider:  the nature and circumstances of the offense and the
defendant's history and characteristics; the need to reflect the seriousness of the offense, to promote
respect for the law, and to provide just punishment for the offense; the need to deter criminal conduct; the
need to protect the public; the need to provide the defendant with needed educational or vocational training,
medical care, or other correctional treatment in the most effective manner; the kinds of sentences and
sentencing ranges established for defendants with similar characteristics under applicable United States
Sentencing Guidelines ("U.S.S.G." or "Guidelines") provisions and policy statements; any pertinent policy
statement of the United States Sentencing Commission in effect on the date of sentencing; the need to avoid
unwarranted disparities among similar defendants; and the need to provide restitution to the victim.
18 U.S.C. § 3553(a).

(i) extraordinary and compelling reasons warrant such a reduction; or

(ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [BOP] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A). This provision is commonly referred to as "compassionate release." *See, e.g.*, *United States v. Escajeda*, 58 F.4th 184, 186 (5th Cir. 2023) ("We often refer to this as 'compassionate release' because courts generally use it for prisoners with severe medical exigencies or infirmities.").

Rather than define "extraordinary and compelling reasons," Congress elected to delegate its authority to the United States Sentencing Commission ("Commission"). *See* 28 U.S.C. § 994(t) (directing the Commission to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples"); *United States v. Jackson*, 27 F.4th 1088, 1090 (5th Cir. 2022); *United States v. Cooper*, 996 F.3d 283, 287 (5th Cir. 2021); *United States v. Shkambi*, 993 F.3d 388, 392 (5th Cir. 2021). Although the Commission had issued a policy statement prior to the passage of the Act that described the reasons that qualify as extraordinary and compelling, that policy statement referenced only those motions filed by the Director of the BOP—thus, the United States Court of Appeals for the Fifth Circuit and other courts held that it was inapplicable to motions filed by defendants on their own behalf. *See Jackson*, 27 F.4th at 1090; *Cooper*, 996 F.3d at 287-88; *Shkambi*, 993 F.3d at 392.

Effective November 1, 2023, the Commission—responding to, among other things, the Act—amended the Guidelines to extend the applicability of the policy statement set forth in U.S.S.G. § 1B1.13 to defendant-filed motions and to broaden the scope of what qualifies as "extraordinary and compelling" reasons potentially warranting compassionate release. *See* U.S.S.G. § 1B1.13. Section 1B1.13(b), as amended, identifies six categories of circumstances that may qualify as "extraordinary and compelling." *Id*. § 1B1.13(b). These categories are: (1) the medical circumstances of the defendant; (2) the age of the defendant; (3) the family circumstances of the defendant; (4) whether the defendant was a victim of abuse while in custody; (5) other reasons similar in gravity to those previously described; and (6) an unusually long sentence. *Id*. § 1B1.13(b)(1)-(6).

As a result, a prisoner seeking compassionate release on his own motion must satisfy the following hurdles. The defendant must have exhausted his administrative remedies; "extraordinary and compelling reasons" must justify the reduction of his sentence or he must satisfy the requirements of § 3582(c)(1)(A)(ii); the reduction must be consistent with the Commission's applicable policy statements; and the defendant must convince the court to exercise its discretion to grant the motion after considering the § 3553(a) factors. *See Jackson*, 27 F.4th at 1089; *Shkambi*, 993 F.3d at 392; *accord United States v. Rollins*, 53 F.4th 353, 358 (5th Cir. 2022).

A.   <u>Exhaustion of Administrative Remedies</u>

Section 3582(c)(1)(A)'s plain language makes it clear that the court may not grant a defendant's motion for compassionate release unless the defendant has complied with the administrative exhaustion requirement. 18 U.S.C. § 3582(c)(1)(A); *United States v. Garrett*, 15

F.4th 335, 337 (5th Cir. 2021) ("[T]o file a proper motion for compassionate release in the district court, a prisoner must first exhaust the available administrative avenues."); *United States v. Franco*, 973 F.3d 465, 467 (5th Cir. 2020) (holding that the statutory requirement that a defendant file a request with the BOP before filing a motion for compassionate release in federal court "is *not* jurisdictional but that it *is* mandatory").  Accordingly, before seeking relief from the court, a defendant must first submit a request to the warden of his facility to move for compassionate release on his behalf and then either exhaust his administrative remedies or wait for the lapse of 30 days after the warden received the request.  18 U.S.C. § 3582(c)(1)(A); *Garrett*, 15 F.4th at 338 ("[A]n inmate has two routes by which he may exhaust his administrative remedies.  Both begin with 'requesting that the [BOP] bring a motion on the defendant's behalf.'" (quoting *Franco*, 973 F.3d at 467)).

Here, Bourque has exhausted his administrative remedies.  On June 20, 2022, Bourque submitted a request for compassionate release to S. Salem, the warden of the facility where he is housed.  On September 7, 2022, Warden Salem denied Bourque's request, explaining that Bourque was stable, not terminally ill, and capable of providing self-care in a correctional setting.  Although Bourque complied with the exhaustion requirement before filing his motion for compassionate release, nothing in the motion indicates that extraordinary and compelling reasons exist to reduce his sentence.

    B.   <u>Medical Condition</u>

In the pending motion, Bourque asserts that he is eligible for compassionate release due to his "serious" medical problems.  Specifically, Bourque maintains that he suffers from the

following medical conditions:  "Alcohol Use Disorder: severe,[2] Epilepsy/Seizure Disorder, Unspecified Traumatic Brain Injury, Dyshidrotic Eczema, Unspecified Neurocognitive Disorder due to brain injury, Headache, and Adult Antisocial Disorder."  Bourque describes in detail the traumatic brain injury that he suffered while in BOP custody in August 2019, explaining that another inmate assaulted him by inflicting "deep stab wounds to his face," which caused him to suffer "major head trauma," "multiple facial fractures," and "contusions."  Bourque then underwent surgery and a 22-day hospitalization, during which time he had a seizure and suffered from pneumonia and respiratory failure.  Bourque complains that, since this assault, he has experienced "double vision, suffered a seizure in February of 2020, and takes several medications for his traumatic brain injury."

With respect to a defendant's medical circumstances, § 1B1.13(b)(1)(A) states that extraordinary and compelling reasons exist if the defendant's motion presents the following circumstances:

> (A)    The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end-of-life trajectory).  A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required.  Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-state organ disease, and advanced dementia.

U.S.S.G. § 1B1.13(b)(1)(A).  This provision is plainly inapplicable to the case at bar—none of Bourque's medical conditions are terminal.    To the contrary, several of Bourque's conditions—such as headaches and eczema—are commonplace, and all of his afflictions are well managed with medication, treatment, and monitoring.  For example, the most recent seizure about

---

[2] The court notes that Bourque's Alcohol Use Disorder is repeatedly described as "mild" throughout his medical records, including in diagnoses dated April 4, 2023, January 10, 2022, January 21, 2021, July 2, 2020, and June 18, 2019 (#731-3, #726-1).

which he complains occurred in February 2020, over three years prior to his filing the current motion. Moreover, a medical record dated December 15, 2022, documents that after Bourque complained that he was suffering from headaches, a BOP physician prescribed him oxcarbazepine. That same record notes that Bourque's seizure disorders are "managed with Valproic acid."

Indeed, as Warden Salem noted in his letter denying Bourque's request for compassionate release, "[Bourque's] condition is stable, he is not terminally ill, and his life expectancy is normal for age." Warden Salem further stated that Bourque "is able to independently attend to all activities of daily living and his medical conditions do not affect his ability to function in a correctional setting." Although the court does not doubt that Bourque experienced (and continues to experience) medical issues as a result of the aforementioned assault, it appears that he has made substantial strides in his recovery. In fact, a medical record dated May 18, 2020—less than a year after Bourque was assaulted—included the following observations regarding Bourque: "Respirations are easy. Alert & oriented. Speech is clear. Skin is normal in color. Inmate voices no complaints at this time."

Furthermore, while Bourque argues that other courts have found that seizure disorders, hepatic dysfunction,[3] and brain injuries constitute "extraordinary and compelling reasons" warranting compassionate release, the court observes that the cases upon which Bourque relies concern defendants with differing medical conditions and circumstances in terms of origin, severity, and treatment. Moreover, these cases do not apply the recent amendments to the

---

[3] It is unclear to the court why Bourque relies upon cases involving hepatic dysfunction, given that he raises no complaints of liver issues. While Bourque has been diagnosed with a "mild" form of alcohol use disorder, his medical records are devoid of any mention of hepatic dysfunction or other liver conditions.

Guidelines that took effect on November 1, 2023.  *See United States v. Malone*, 57 F.4th 167, 174-75 (4th Cir. 2023) (criticizing the district court for applying § 1B1.13 to a "defendant-filed" compassionate release motion and noting that the defendant was sixty-eight years old and "struggled with countless physical health ailments related to the aging process," including "colon-rectal cancer and a permanent colostomy bag," as well as "cystic kidney and liver disease"); *United States v. Patten*, 560 F. Supp. 3d 613, 615-17 (D.N.H. 2021) (concluding that a defendant's "multiple chronic liver conditions" and "hyperlipidemia," "combined with a documented risk that he could contract [COVID-19] . . . constitute[d] extraordinary and compelling reasons for a sentence reduction"); *United States v. Spencer*, 519 F. Supp. 3d 237, 240, 252 (E.D. Pa. 2021) (determining that a defendant was "at increased risk for severe illness or death from COVID-19" where he had "suffered at least seven grand mal seizures in custody," "lost motor function along the right side of his body," and "ha[d] not been able to receive adequate medical care for his seizure disorder or his [tuberculosis] diagnosis in prison" as a result of the COVID-19 pandemic); *United States v. Bandrow*, 473 F. Supp. 3d 778, 782, 786 (E.D. Mich. 2020) (noting the defendant's "heightened susceptibility to severe complications from [COVID-19]" due to his asthma, epilepsy, and hematuria, particularly where the defendant's BOP facility "ha[d] been unable to provide [the defendant] with the CT urogram and urology consultation he need[ed] to address [his hematuria]").  Bourque accordingly fails to demonstrate that his medical disorders constitute extraordinary and compelling reasons warranting compassionate release under § 1B1.13(b)(1)(A).

Bourque's medical condition likewise fails to satisfy the criteria under § 1B1.13(b)(1)(B). This provision applies when:

(B)     The defendant is—

    (i)     suffering from a serious physical or medical condition,

    (ii)    suffering from a serious functional or cognitive impairment, or

    (iii)   experiencing deteriorating physical or mental health because of the aging process,

        that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13(b)(1)(B).  As noted in Warden Salem's aforementioned comments, none of Bourque's medical problems substantially diminish his ability to provide self-care within the context of a correctional facility.  Bourque's medical records reveal that he is ambulatory and is cleared for food service.  While he is subject to certain restrictions (no climbing, no driving, no lifting more than 15 pounds, no work around potentially dangerous machinery, and no outdoor work), none of these limitations preclude him from providing self-care within his BOP facility.  Indeed, the same records show that the BOP is accommodating Bourque's "traumatic brain injury, cognitive impairment, and dizziness" by placing him in a lower bunk in a cell on the first floor.

Bourque's capacity to function within the correctional facility is further demonstrated by his classification as a BOP Medical Care Level 2 inmate.  According to the BOP's Clinical Practice Guidance, dated May 2019, Care Level 2 inmates "are stable outpatients who require clinician evaluations monthly to every 6 months.  Their medical and mental health conditions can be managed through routine, regularly scheduled appointments with clinicians for monitoring. Enhanced medical resources, such as consultation or evaluation by medical specialists, may be required from time to time."  Additionally, Bourque states that, upon his release, he intends to

serve as a "manager/maintenance man" for his grandmother's rental properties.   Bourque's

contention that he is capable of performing such duties despite his medical conditions indicates that

his ailments are not so serious that they substantially diminish his ability to provide self-care.[4]   The

court accordingly concludes that Bourque's circumstances do not warrant compassionate release

under § 1B1.13(b)(1)(B).

Finally, Bourque is similarly ineligible for compassionate release under § 1B1.13(b)(1)(C),

which provides that extraordinary and compelling reasons exist when:

> (C)   The defendant is suffering from a medical condition that requires long-term
> or specialized medical care that is not being provided and without which the
> defendant is at risk of serious deterioration in health or death.

U.S.S.G. § 1B1.13(b)(1)(C).   While Bourque conclusorily states that his "medical conditions

require medical care that can be provided by a hospital, not a prison or even a Federal Medical

Center," Bourque fails to specify the particular medical conditions he is referencing, much less

the types of medical care of which he believes he is being deprived while incarcerated.   None of

Bourque's medical conditions require long-term or specialized care that is not being provided.   As

explained above, Bourque's conditions are well managed with medication, treatment, and

monitoring.   Furthermore, Bourque has not shown that without such hypothetical supplemental

medical care, he is at risk of serious deterioration in health or imminent death.   The court is thus

unconvinced that § 1B1.13(b)(1)(C) is applicable to Bourque's situation.

In this instance, Bourque's reported medical conditions are not terminal, do not require

specialized medical care, do not substantially diminish his ability to provide self-care in the prison

---

[4] In any event, Bourque's interest in managing and maintaining his grandmother's apartments is
a moot point, as his grandmother informed Probation that although "at one time she owned and managed
200 to 300 apartments," "she has since disposed of all her apartments."

setting, and do not limit his activities of daily living.  He likewise fails to establish that his medical conditions require long-term or specialized medical care that is not being provided.  As a result, Bourque's assertion that his medical conditions merit compassionate release must be rejected.

C.    Family Circumstances

Bourque next contends that his family circumstances present extraordinary and compelling reasons that justify compassionate release.  In particular, Bourque claims that he is the only available caregiver for his 94-year-old[5] grandmother, Viola Bourque ("Viola").  With respect to a defendant's family circumstances, § 1B1.13(b)(3) provides that extraordinary and compelling reasons exist under any of the following circumstances or a combination thereof:

(A)    The death or incapacitation of the caregiver of the defendant's minor child or the defendant's child who is 18 years of age or older and incapable of self-care because of a mental or physical disability or a medical condition.

(B)    The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(C)    The incapacitation of the defendant's parent when the defendant would be the only available caregiver for the parent.

(D)    The defendant establishes that circumstances similar to those listed in paragraphs (3)(A) through (3)(C) exist involving any other immediate family member or an individual whose relationship with the defendant is similar in kind to that of an immediate family member, when the defendant would be the only available caregiver for such family member or individual.  For purposes of this provision, "*immediate family member*" refers to any of the individuals listed in paragraphs (3)(A) through (3)(C) as well as a grandchild, grandparent, or sibling of the defendant.

---

[5] Bourque's Exhibit F (#726-4), which sets out his Proposed Release Plan Pursuant to Motion for Reduction in Sentence, states that Viola is 97 years old.  His motion, however, refers to her as "92 years old."  According to Probation's report, Viola reported that she was 93 years old on June 21, 2023.

U.S.S.G. § 1B1.13(b)(3).

In the context of § 1B1.13(b)(3), one is incapacitated, whether due to injury or illness, when he is "deprive[d] of capacity or natural power," such that he is unable to provide self-care. *See Incapacitate*, Merriam-Webster.com, https://www.merriam-webster.com /dictionary/incapacitate; *see also United States v. Bautista*, No. 3:15-cr-02720-DMS, 2024 WL 3014637, at *3 (S.D. Cal. June 14, 2024) ("Generally, a person is incapacitated when he is 'completely disabled' and cannot care for himself."). Moreover, "[f]or guidance on what constitutes 'incapacitation,' courts have looked to the [BOP's] guidelines for handling inmate compassionate release requests." *United States v. Al Hunaity*, No. CR 18-723 (RBK), 2024 WL 982044, at *5 (D.N.J. Mar. 7, 2024); *see United States v. Watson*, No. 4:18-CR-40018-KES-1, 2024 WL 1093757, at *2 (D.S.D. Mar. 13, 2024) ("[C]ourts have relied on the BOP program statement in determining that 'incapacitation' requires that the family member have suffered a severe injury or illness, leaving them incapable of acting as a caregiver."). "'Incapacitation' is defined as 'a serious injury, or a debilitating physical illness and the result of the injury or illness is that the [individual] . . . is completely disabled, meaning that the [individual] . . . cannot carry on any self-care and is totally confined to a bed or chair.'" *United States v. Collins*, No. 15-10188-EFM, 2020 WL 136859, at *4 (D. Kan. Jan. 13, 2020) (quoting U.S. Dep't of Just., Fed. Bureau of Prisons, Program Statement 5050.50 (Jan. 17, 2019)); *see United States v. Crider*, No. 6:14-cr-00044-GFVT-HAI-1, 2024 WL 1291492, at *2 n.1 (E.D. Ky. Mar. 26, 2024); *United States v. White*, No. CR16-40, 2021 WL 1721016, at *4 (E.D. La. Apr. 30, 2021).

Here, Bourque's assertion that he is the only available caregiver for Viola, his grandmother, falls under § 1B1.13(b)(3)(D). Absent from Bourque's documentation, however,

is any indication that Viola is incapacitated in that she suffers from a serious injury or debilitating physical illness that renders her completely disabled or that she suffers from a severe cognitive deficit. *See United States v. Romano*, No. 22-CR-12 (KAM), ___ F. Supp. 3d ___, No. 22-cr-12 (KAM), 2023 WL 8735203, at *3 (E.D.N.Y. Dec. 19, 2023) (the defendant's *"*failure to attach any medical evidence or opinions (or similarly competent evidence)*"* rendered *"*the Court unable to make the necessary factual findings*"*); *United States v. Ahmed*, 19 Cr. 603-1 (KPF), 2024 WL 2925112, at *5 (S.D.N.Y. June 10, 2024) (denying compassionate release where the defendant *"*submitted no substantiation of his wife's medical issues*"*). Indeed, Probation reports that Bourque's sister, Tamela Griffin (*"*Griffin*"*), advised that while it is sometimes *"*difficult*"* to talk to Viola and she has *"*some back problems,*"* she is able to walk. Probation also spoke with Viola, noting that she *"*has some hearing problems but was able to communicate after repeating questions two or three times.*"* The record is accordingly devoid of evidence that Viola is incapacitated under § 1B1.13(b)(3).

Moreover, Bourque has not shown that he is the only available caregiver for his grandmother. *See United States v. Lopez*, No. 23-50404, 2024 WL 244935, at *1 (5th Cir. Jan. 23, 2024) (noting that the defendant *"*failed to explain why his other siblings could not care for his parents*"*); *United States v. Garcia*, No. H-21-162-01, 2024 WL 2114311, at *2 (S.D. Tex. May 10, 2024) (stating that the defendant failed to *"*establish that his mother has no other family members, such as brothers or sisters, who can assist with her care*"* and explaining that the defendant's *"*conclusory assertion that his wife is unavailable as a caregiver [did] not meet his burden of proof*"*); *United States v. Watson*, 2024 WL 1093757, at *3 (*"*Without evidence that [the defendant] is the only available caregiver, the court cannot determine whether [the defendant]'s

13

family circumstances give rise to 'extraordinary and compelling reasons' for her release."); *United States v. Wrice*, No. 10-cr-40065-JPG-1, 2023 WL 4030067, at *3 (S.D. Ill. June 15, 2023) (reasoning that the defendant had not "met her burden under the proposed amendments" where she "provide[d] no statements from other family members, no affidavits or letters from medical professionals, and no other verifiable evidence to show that she is the only caretaker available or that [her] stepfather requires a caretaker").

In fact, Probation reports that Viola is currently receiving adequate care, as Viola informed Probation that she pays for healthcare workers to assist her daily.  Additionally, Griffin, who lives only 30 minutes away from Viola, told Probation that she visits Viola "at least once per week or as needed."  Thus, Bourque cannot establish that he is Viola's only available caregiver.  In any event, Bourque has not shown that he would be a suitable caretaker for Viola if he were to be released both as to his physical abilities and his criminal record.  In fact, Griffin stated that Bourque is not allowed to reside at her residence if released.  She expressed safety concerns for her family due to Bourque's criminal history, including the instant federal conviction stemming from the murder of James Lee Sedtal ("Sedtal").  As a result, the court concludes that Bourque's purported need to care for his grandmother fails to constitute an extraordinary and compelling reason warranting compassionate release.

D.    Rehabilitation

In addition, Bourque maintains that his post-sentence rehabilitation, evidenced by the educational programs he has completed and the letters of support submitted by his friends and family, establishes extraordinary and compelling reasons for compassionate release.  Regarding rehabilitation of the defendant, the amended policy statement recognizes:  "Pursuant to 28 U.S.C.

14

§ 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement." U.S.S.G. § 1B1.13(d); *accord United States v. Martinez*, No. 23-50418, 2024 WL 658952, at *1 (5th Cir. Feb. 16, 2024) ("Even if [the defendant] were reformed, his rehabilitation efforts alone are not an extraordinary and compelling reason for release."); *United States v. Handlon*, No. 23-50386, 2024 WL 111787, at *1 (5th Cir. Jan. 10, 2024) (holding that the defendant's "rehabilitation efforts alone are not an extraordinary and compelling reason for his release"). Nonetheless, the amendments add a proviso that states: "However, rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted." U.S.S.G. § 1B1.13(d).

Here, the court is unconvinced of Bourque's rehabilitation, particularly in light of the significant disciplinary record that he has accrued while incarcerated. As a noteworthy example of Bourque's continued propensity for violent behavior, in May 2019, Bourque assaulted another inmate with a homemade weapon, causing "serious injury" to the inmate and wounding a BOP staff member. As punishment for this infraction, Bourque was placed in the Special Housing Unit for approximately seven months. Bourque claims that, after he suffered an assault himself in August 2019 while in the Special Housing Unit, he was "changed . . . forever" and "can no longer engage in the conduct that led him to the Special Housing Unit, nor does he wish to do so." The court observes, however, that Probation reports that as recently as October 13, 2022, Bourque was disciplined for engaging in "disruptive conduct."

In any event, Bourque has failed to demonstrate that any other circumstances warrant a reduction in his term of imprisonment. Thus, even if the court were to conclude that Bourque had

been successfully rehabilitated, this fact, without more, does not merit compassionate release. U.S.S.G. § 1B1.13(d) (citing 28 U.S.C. § 994(t)).  While the court hopes that Bourque will continue on the path to rehabilitation, it declines to exercise its discretionary authority under § 3582 at this time based on either Bourque's medical conditions, his family circumstances, or his rehabilitation efforts.

    E.    <u>Section 3553(a) Factors</u>

The court further finds that compassionate release is not merited in light of the applicable factors set forth in 18 U.S.C. § 3553(a).  *See* 18 U.S.C. § 3582(c)(1)(A) (requiring courts to consider the § 3553(a) factors before granting compassionate release); *United States v. Chavez*, No. 23-50684, 2024 WL 940263, at *1 (5th Cir. Mar. 5, 2024); *Rollins*, 53 F.4th at 358-59; *United States v. Shorter*, 850 F. App'x 327, 328 (5th Cir. 2021) (finding that the court did not abuse its discretion in denying compassionate release after balancing the § 3553(a) factors); *United States v. Keys*, 846 F. App'x 275, 276 (5th Cir. 2021); *Shkambi*, 993 F.3d at 392; *United States v. Thompson*, 984 F.3d 431, 435 n.11 (5th Cir. 2021) (collecting cases); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020).  Bourque's offense of conviction stems from his commission of murder in aid of racketeering activity in connection with his role as a "council member" of a white supremacist gang known as "Solid Wood Soldiers" and "Separate White State" ("SWS").  Specifically, after his fellow SWS member, Sedtal, shot and wounded a member of a rival gang, Bourque decided that he and other SWS members needed to murder Sedtal in order to prevent the rival gang from retaliating against SWS.  Bourque, who was also known as "Hit Man," accordingly formulated and executed a plot to murder Sedtal.

On March 13, 2011, Bourque arranged for Sedtal to be brought to SWS associate Vicki Stark-Fitts's ("Stark-Fitts") residence in Hull, Texas, where Bourque had placed a .22 revolver equipped with a make-shift silencer in the trunk of a stolen Nissan Maxima in preparation for the murder.   After Sedtal arrived at Stark-Fitts's residence, SWS "soldier" Kenny Don Stanley ("Stanley") followed Bourque's instructions and shot Sedtal in the head with the revolver.   Stanley and SWS "Captain" Kristopher Leigh Guidry ("Guidry") then placed Sedtal in the trunk of the Maxima.   After Stanley heard moaning noises coming from inside the trunk, Stanley opened the trunk and shot Sedtal a second time.   In an effort to destroy the evidence, Bourque, Stanley, Guidry, and Stark-Fitts then traveled toward Rye, Texas, where they parked the Maxima at the end of a secluded logging trail.   The group used lighter fluid to set the vehicle on fire, leaving it to burn with Sedtal's body still in the trunk.   Bourque, Stanley, Guidry, and Stark-Fitts then fled to Arlington, Texas, to "hide out."   Later, Bourque "promoted" Stanley and Guidry within SWS to reward them for carrying out his orders to murder Sedtal.   Ten days after the murder, a man called 911 to report that he had discovered the burned Maxima with human remains in the trunk. Bourque was subsequently arrested while attempting to hide in the driveway of Stark-Fitts's residence.   At the time of his arrest, Bourque was in possession of a ballistic vest and a .38 caliber revolver.

In addition to the nature and circumstances of his offense of conviction, Bourque's lengthy criminal history similarly demonstrates that his release would not align with the § 3553(a) factors. Specifically, Bourque's criminal history includes prior convictions for Theft, Deadly Conduct, Aggravated Assault, Failure to Stop and Render Aid, Criminal Simulation, Alcohol Open Container Vehicle, Failure to Appear, Possession of a Controlled Substance (Cocaine), and Felon

in Possession of a Firearm.  Probation also reports that Bourque has accumulated a significant disciplinary record while incarcerated, including infractions for failing to stand count on five separate occasions, refusing a work/program assignment on two separate occasions, engaging in a group demonstration, disruptive conduct, possessing an unauthorized item, possessing a non-hazardous tool, possessing drugs/alcohol, and possessing a dangerous weapon.  Most significantly, in May 2019, Bourque engaged in "assault with serious injury" while possessing a dangerous weapon.  Although Bourque obliquely acknowledges in his motion that he "engaged in conduct that caused him to be in the Special Housing Unit in August of 2019," he omits that his placement in the Special Housing Unit resulted from this particular disciplinary infraction.  Specifically, according to various incident reports (#730-2), Bourque struck another inmate in the head and upper torso area "with a homemade weapon," which was described as "a clear piece of plastic approximately seven and one half inches long . . . , sharpened at one end forming a stabbing style homemade weapon."  Then, as BOP staff attempted to subdue the inmates, Bourque struck a responding staff member "[t]wice in the top of [his] left hand and once in [his] left forearm."  Both the inmate and the BOP staff member were taken to the local hospital to have their injuries evaluated.

The court further observes that Bourque has a substantial history of poly-substance abuse, including the daily use of alcohol and methamphetamine, weekly use of ecstasy and hallucinogens, and occasional use of cocaine and marijuana.  Regarding Bourque's history of substance abuse, courts are precluded from "lengthening a prison term in order to promote a criminal defendant's rehabilitation," but in the present case, the court is deciding whether to reduce, not extend, a sentence.  *Tapia v. United States*, 564 U.S. 319, 321 (2011); *see Chambliss*, 948 F.3d at 694.

Here, Bourque's disciplinary record reflects that he has continued to rely on illicit substances while incarcerated, as Probation reports that he was disciplined in November 2015 for "possessing drugs/alcohol." Bourque also readily admits that he suffers from Alcohol Use Disorder, claiming that this medical condition (among others) warrants compassionate release. The court is of the opinion that releasing Bourque may facilitate his continued poly-substance abuse, as he would gain unfettered access to alcohol, as well as over-the-counter medications and illegal drugs, outside the BOP.

In addition, granting Bourque compassionate release would fail to provide just punishment for his offense and promote respect for the law. In *Chambliss*, the Fifth Circuit upheld the denial of compassionate release due to the defendant's not yet having served a sufficient portion of his sentence. 948 F.3d at 694. The district court determined that the defendant's terminal illness "constitute[d] 'an extraordinary and compelling reason for a sentence reduction' and that he '[did] not present a danger upon release,'" but denied release because "releasing [the defendant] after serving only 14 years of a 30-year sentence minimizes both the impact of [the defendant's] crime and seriousness of the offense." *Id.* at 693-94. "Moreover, the [district] court, citing the § 3553(a) factors, determined that requiring [the defendant] to serve the remainder of his sentence would 'provide just punishment for the offense' and 'afford adequate deterrence to criminal conduct.'" *Id.* at 694; *see Rollins*, 53 F.4th at 359-60; *Thompson*, 984 F.3d at 434-35 (observing that the courts that have granted compassionate release "largely have done so for defendants who had already served the lion's share of their sentences and presented multiple, severe, health concerns"); *accord United States v. Rodriguez*, 27 F.4th 1097, 1100 (5th Cir. 2022). In the case at bar, releasing Bourque after he has served only 10 years of his sentence of life imprisonment

19

would similarly minimize the impact of his crime and the seriousness of his offense as well as fall short of providing just punishment and adequate deterrence to criminal conduct.  On balance, compassionate release is not warranted in light of the applicable factors set forth in § 3553(a).

As the court noted in *United States v. Preston*, "[t]he best predictor of how [Defendant] will behave if he were to be released is how he behaved in the past, and his track record is a poor one."  No. 3:18-CR-307-K, 2020 WL 1819888, at *4 (N.D. Tex. Apr. 11, 2020) (quoting *United States v. Martin*, 447 F. Supp. 3d 399, 403 (D. Md. 2020)).  Here, Bourque's track record is similarly a poor one.  There is no reason to believe that Bourque would not revert to his prior criminal activities, including his gang activity with SWS, his use of illegal substances, his assaultive behavior, and his unlawful possession of firearms if released from prison at this time.  *See United States v. Wymer*, 573 F. Supp. 3d 1208, 1212 (N.D. Ohio 2021).  In this case, Bourque's past behavior gives cause for concern as to his future conduct.

In sum, in view of the nature and circumstances of his offense of conviction, Bourque's extensive criminal history, his misconduct in prison, and his history of poly-substance abuse, the court cannot conclude that Bourque's early release from prison would afford adequate deterrence or protect the public, as he continues to pose a danger to other persons and to the community as a whole.  Like the court in *United States v. Lewis*, this court concludes that "Defendant's current term of imprisonment was and remains appropriate."  No. 17-CR-28-FPG, 2021 WL 4519795, at *3 (W.D.N.Y. Oct. 4, 2021).  Bourque committed a serious offense that justified his sentence, and the circumstances he now identifies do not render that sentence unjust or inequitable.  *See id.*

F.      Modification of the Terms of Supervised Release

Bourque further asserts that, if early release is granted, the court can modify the terms of his supervised release to include home confinement, if deemed appropriate.  The court, however, will not modify Bourque's conditions of supervised release at this time, as it does not find that he is entitled to compassionate release.  *See United States v. Blank*, 854 F. App'x 559, 561 (5th Cir. 2021) ("A district court retains jurisdiction to modify conditions of supervised release, *see* 18 U.S.C. § 3583(e)(2), and has 'wide discretion in imposing terms and conditions of supervised release' so long as 'the conditions meet certain criteria.'" (quoting *United States v. Paul*, 274 F.3d 155, 164 (5th Cir. 2001))).

III.    Conclusion

In sum, Bourque has failed to satisfy his burden of showing the necessary circumstances to warrant relief under the statutory framework to which the court must adhere.  The sentence of life imprisonment imposed upon Bourque for his offense of Violent Crimes in Aid of Racketeering Activity—Murder comports with the 18 U.S.C. § 3553(a) factors, and he has adduced no extraordinary and compelling reasons to lessen his sentence or release him from prison at this time.  Neither his health, his family circumstances, nor his efforts at rehabilitation merit a reduction of sentence under these circumstances.  Accordingly, Bourque's Motion for Reduction of Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A) (#724) is DENIED.

SIGNED at Beaumont, Texas, this 12th day of July, 2024.

*Marcia A. Crone*
_____
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE